The objection was sustained by the court and such ruling excepted to.

In a proper case, threats, though uncommunicated to the defendant, would be admissible as competent testimony. There is nothing before us to show whether this was a proper case to render such testimony admissible or not.

Errors may have occurred during the progress of the trial, but the evidence appearing in the bill of exceptions is too meagre and disconnected to enable us to discover them.

The judgment is affirmed

All concur.

THE TERRITORY OF NEW MEXICO, Appellee, v. ELIJAH FRANKLIN, Appellant.

*February, 1882.*

CRIMINAL LAW.   (1)   *Murder: Intoxication as a defense.*
SAME.   (2)   *Practice, right of judge to comment upon evidence.*
SAME.   (3)   *Jury: Review of verdict by supreme court.*

1. Where the evidence given on a trial for murder shows the prisoner to have been drunk at the time of the killing, it is not erroneous to

instruct the jury to the effect that if the defendant was conscious of and understood what was done and said by himself and others present at the time of the killing so as to give an intelligent and true account of it at the trial, in that case he is responsible for his conduct at that time.

2.  *Quære.*   Whether the statute forbidding the judge to comment upon the weight of evidence applies to criminal cases.

    A statement by the court to the jury that a man cannot at the same time be drunk and sober, conscious and unconscious, responsible and irresponsible, is not a comment upon the weight of evidence, but merely a statement of a truth in mental philosophy.

3.  It is the province of the jury to pass upon the facts, and their finding will not be reviewed except where clearly contrary to the evidence or manifestly the result of prejudice. ·Finding that defendant was guilty . of murder in the first degree affirmed.

Appeal from District Court of Grant county. BRISTOL, J. Murder.   The facts appear in the opinion of the court.

PARKS, Associate Justice:   At the A. D. 1881 term of the district court of Grant county, the defendant was tried and convicted of murder in the first degree, was sentenced to death, and appealed to this court.   The record shows that during the trial, his counsel admitted that the defendant killed the deceased at the time and place and with the weapon described in the indictment, but claimed that the killing was accidental.   For a proper understanding of the case, we will quote part of the testimony and instructions.   The evidence we reproduce here is somewhat lengthy, but as it substantially and fairly, as we think, represents the whole case on both sides, it will obviate the necessity for any extended argument or lengthy opinion by the court.   For the prosecution James H. Fowler testified as follows :

" I live in Central City, in this county ; I know the defendant, Elijah Franklin here (here the witness points out the prisoner and identifies him) ; I know the deceased, Thomas Williams ; I was in Central City when he was shot ; I did not see the defendant shoot him, because Tom Williams was between me and Franklin at the time ; I saw the smoke from

Franklin's pistol, and just about that time Tom Williams ran and grabbed for a pistol; this was in my saloon in Central City, Grant county, territory of New Mexico; there were five or six persons in the saloon at the time, Catarino Maldonado, Jack Winters and others were in there; the prisoner and Tom Williams were the parties to the difficulty; there was a table right in front of me and Tom was standing near the corner of the table and near the wall; he then came around to the corner of the table next to the stove and sat down; he was sitting in a chair and was lying with his head in his hands on the corner of the table; while he was in this position I heard the prisoner say: 'Boys, good-bye,' and then he turned to some others and said: 'Let us go home;' just at that time I heard a shot fired, and some one in the crowd says: 'Tom Williams is shot;' the deceased was sitting in a chair with his head on the corner of the table; Franklin had just at that time come around to the corner of the table where the deceased was sitting and shot him in the left side; just before he shot he bid the boys good-bye and said he was going home; right away after the shot, the deceased got up from his chair; he looked like he had been asleep and he waked up and went around by the bar and fell; I don't think deceased had a pistol about him; I told him he was shot, and he said: 'No, I ain't shot, let me alone;' this was all he said; I saw the prisoner up to the time the deceased fell; then he (the prisoner) ran out of the house; the first I noticed of the pistol being in Frankin's hand, was after the shot was fired that killed Williams; at the time of the shooting, the other parties, some of whom were around the stove and some around the table; the defendant was just around the corner in front of them; the deceased was only shot once; he was shot through the left side; the ball did not go through him; Williams died a few minutes after the shot, so I afterwards understood; that is all I know of the circumstances."

John H. Winters, testified as follows:

" I was present when this shooting took place. It was on the 27th of November last, that the defendant and two other soldiers came into the saloon in Central City; Franklin had a pistol, similar to the one produced here (here the witness was shown a pistol by the district attorney); Williams the deceased, was a deputy sheriff at the time. The deceased told the defendant he must take his pistol off; defendant said he was going home and would not take it off; deceased then told him to go home, and if he came with his pistol on any more he would have to arrest him; defendant then said 'neither you nor Jesus Christ couldn't take this pistol from me; it is my property, and I bought and paid for it;' after this, Franklin and some one or two others went out and were gone for a little while; when after a while defendant came in, he had fell into an adobe hole outside, near the house; he told me he had fell into this hole, and said somebody had taken his pistol; I got a light and went out to where he said he had fallen, and I found the pistol in the adobe hole; when the defendant came into the saloon, he laid down on some benches and went to sleep; the deceased and a man by the name of Moraldes had went out the second time after defendant come there, and after a little while came back, and the defendant was still asleep; there were several others came in about the time Williams and Moraldes came, and then they all commenced singing; the singing waked Franklin up; he then got up and stood some time; the deceased was then sitting down on a corner of a bench with his head on his hand, leaning on the corner of the table; the table was in something like the same position of this table in the court room; I was sitting at the centre of the table, and Mr. Fowler was sitting beyond me, near the stove; he was further over on a bench with his back towards the wall; Williams was sitting at the other corner of the table; while they were singing, Lockey said he was going up to the post, and Franklin said he would go up with him;

just about this time the defendant told me to make a cigarette for him, which I done; Franklin while sitting there had a pistol in his hand; the muzzle of it was pointed towards me; I turned the muzzle of the pistol the other way, as I didn't care about having it pointed toward me; after I gave him the cigarette, he said, 'I will go home now;' just then he pulled his pistol, pointing it at the deceased and fired; I was close enough to the defendant at this time to put my hands on him; I saw the defendant and was looking at him when he raised the pistol; he pointed at the deceased; he pulled his pistol off—(By the Court), is the pistol in the court, Mr. Garrison? Yes, sir. (Here the witness took the pistol in his hand and held it in a horizontal position, pointing it and illustrated how the prisoner held it when he shot deceased). (Witness) The pistol was a self-cocking pistol, and will fire off either by cocking it or pulling the trigger."

The defendant testified as follows:

"I was down in Central City on Saturday night; I don't know what date of the month it was; before I left the "post," I went to the sutler's store and got two bottles of whisky there; I then went down and played billiards, and afterwards went into a man's saloon by the name of Jim; I don't know his other name; he was a white man.

Q. Was it Mr. Fowler here?

A. Yes, sir; that is the man; we went into his saloon and got a drink in there; then I went to Mr. Vest's house and got more whisky; after I staid there a little while, I went into Carrol's house again and got more whisky there; then I came back, and by this time, I was pretty drunk. I laid down on the bench to take a sleep, and the pistol fell out of my pocket; I picked it up and put it back, and it fell out again; I was so drunk at this time that I could hardly walk, and a man in there asked Winters what was the matter; I didn't hear what Winters said; then he asked me what was the matter with me; I did'nt say anything; I laid

a little while, I don't know how long, and I fell off the bench;
I got up again somehow, and I laid down on the bench
again; I soon got up again and thought I would go home,
but I could not walk, I was so drunk, so I laid down again,
and staid for some time; after a while I started out of the
house intending to go home, and I got from the house a lit-
tle piece when I fell into a hole where they had been mak-
ing adobes; I was there some time before I·could get out,
and after I got out, I seen I was too drunk to undertake to
go to the post, so I came back to the house again, and when
I came back some one asked me what I done with my pistol;
I said I didn't know, and one of the boys said "You carried
it out with you when you said you were· going to camp;" I
said "If it is gone, why let it go;" when I left camp that
day I never took any pistol with me at all; I never carry a
pistol; I had a pistol of my own, but did not take it with
me; the pistol that I had at the saloon was not mine; I don't
know how I came by it that day; the only way I can account
for having it somebody must have put it in my pocket when
I didn't know it; after I came back, when I got out of the
adobe hole, somebody brought the pistol in and said they found
it in the adobe hole and gave it back to me.   While I was
laying down, several Mexicans came in and, after· awhile,
commenced singing; that woke me up, and when I awoke I
was very sick; I wanted to vomit; I sat up a little while on
the bench I· was lying on near the stove, and took out a bot-
tle of whisky and passed it around; I then went around to the
corner of the table and Jack Winters gave me a cigar and
also gave Lacadue one; I sat there awhile, and I says to
Jack "I can't smoke it," and he says "You are too drunk."
I had the pistol on the corner of the table, because I did not
want to carry it in my pocket, as it had fell out of my pocket
twice before, and I was afraid if it fell on the floor it might
go off; after I started to get up off the corner of the table,
the pistol went off; I don't know how it came to go off; I

know that I had no intention of shooting anybody, because I had nothing against anyone there; I do not recollect of seeing Tom Williams at all until after the pistol went off; Jack says, "Franklin, you shot Tom;" I said, "No, what would I shoot Tom for," and I looked around and saw Tom standing out on the floor; I started towards Tom, and they all said, "Shoot him" (meaning defendant), and I says, "No, gentlemen, I didn't shoot him;" I didn't think I had, because I hadn't seen Tom at all before that, and I never had a thing against him; as soon as they all commencing hallooing "Shoot him," I started to walk out of the door, and they said, "You shot Tom Williams;" I said I didn't come here to shoot any one, that the shooting was done accidentally;" some one in the house then came up and struck me over the head with a six-shooter; I told them not to kill me, that if I shot Tom Williams, I did not mean it, that it was done accidentally, that I did not come here to shoot any one;" I went to the outside of the door, and they carried me back to the house inside; then I went and asked Tom if I shot him; that if I did, I have no recollection of it, that it was accidental; he said, "Go away, don't bother me, you shot me," and I said no more to him.

Q. How long did you know Tom Williams?

A. I had known him twelve years.

Q. Now take this pistol and explain to the court and jury the position it was in when it went off? (Here the witness takes the pistol and goes to the corner of the table in the court-room and sits on the corner of the table in a leaning position with his right arm across his leg and resting on it, with pistol in right hand and the muzzle of it in range with the table, the end of the barrel ranging downwards and nearly touching the table; the position of the witness and the manner in which the pistol was held rather indicated indifference and carelessness—REPORTER.) Explain to the jury the position of the pistol when it was discharged.

A. I am not certain that this is the pistol—the pistol—I had never saw it before that night; I just picked the pistol off the table like, and took hold of the stock, as near as I can remember; I never owned a pistol like this in my life, and didn't know anything about it; I have a government pistol, but did not take it with me that day; if I had wanted to shoot anybody, I could have taken it along with me; the pistol I did have was like this (the one in court).

Q. Was this pistol you had there a self-cocking pistol?

A. I don't know whether it was or not; I never had it in my hand before that day.

Q. Can you tell me how it came the pistol went off; that is, what caused it to be discharged?

A. No, sir; I cannot tell what caused it to go off.

Q. Where did you take your first drink on that day?

A. I took it at the hospital, and a short time after me and Bill Bemkins took two drinks apiece more, and then Bank came down to the hospital with a bottle of brandy and two cigars, and we drank again; we must have drank six or seven drinks apiece; then we went down to the sutler shop and got two bottles of whisky over there; we staid in there some time, and came out and took another drink; we staid around there until we must have taken four or five drinks more out of the bottle; then we took two or three drinks more on the road to Sam's; we got more whisky at Carrol's, and drank two or three times there; I was drinking all the time since the time I took my first drink at the hospital until the time I left the saloon that night, except about a half an hour. I laid down on the benches at the saloon.

Q. Who all were in the room when this accidental shooting occurred?

A. I don't recollect who were there except Jack Winters, Lacadue Henderson; I don't know the Mexicans who were in.

Q. Were you drunk when the shooting occurred?

A. I don't recollect whether I was drunk or not; I know

I had a great deal of liquor in me, and I tried to go home and couldn't; I went out of doors once to go home, and I was so drunk I had to come back, because I couldn't make my way, and when I came back I had to set down; this was just before the shooting; if I started to go home, I knew I was liable to fall down somewhere and get lost; I didn't see Williams in the room at all that night; the first time I saw Williams was when I first went down to Central City; I remember the thing he said, to put that pistol up; I said I bought that pistol, and paid for it; I might have said that neither he nor Jesus Christ could take it from me; I don't remember what I said; I suppose I talked like a drunk man would; I cannot say whether I made that remark or not; somebody must have put the pistol in my pocket at the quarters; I know I never had the pistol in my hands before that night, I have seen the same pistol before; I know who it belongs to.

By THE COURT—You say you know who it belongs to?

A. Yes, sir. (Here witness was again asked to describe the position he occupied and the manner he held the pistol when it was discharged, and he related the position substantially as given before—REPORTER.) When I picked the pistol up it went off, but I cannot caused it to go off; I did not intend it to go off. When I took hold of it I think I must have placed my finger on the hammer; if it was not a self-cocking pistol, it never could have went off in the world; that was the reason the pistol must have went off; when I lifted the pistol up, I intended to go home; I didn't see Williams at all then.

Q. You say you had no trouble with any one that was there that night?

A. No, sir; I had nothing against any one there.

Q. Did you ever have trouble with any one in that neighborhood?

A. There was a man by the name of Davis who said he " allowed to kill me if he caught me."

There was other testimony, but it does not materially change the case made by the evidence of these three witnesses. There is no ground of reversal in the action of the jury in finding a verdict of guilty on this evidence. They evidently thought that the pistol went off because the defendant desired it to do so, and we cannot say from the evidence that they were wrong in this opinion.

As to the instructions excepted to they expressly leave the mental condition of the defendant to be formed by the jury. It is true the court told the jury in effect that a man cannot at the same time be drunk and sober, conscious and unconscious, responsible and irresponsible, a truth about as obvious as that two bodies cannot occupy the same space at the same time.

This was not a comment on the weight of evidence. It was merely the statement of a truth in mental philosophy, which formed the foundation of the instructions objected to by defendant.

This objection assumes that the statute forbidding the judge to comment on the weight of evidence applies to criminal cases, which is by no means settled, and which it is unnecessary now to determine.

Changing the form but not the obvious meaning of the instructions may be expressed thus:

If the jury believe from the evidence that at the time of the killing, the defendant was so drunk as to be unconscious and irresponsible, in that case his testimony as to what took place while he was in that condition is of little or no value. Or, transposing it, if the jury believe from the evidence that the defendant was conscious of and understood what was done and said by himself and others present at the time of the killing so as to give an intelligent and true account of it

at the trial, in that case he is responsible for his conduct at that time.

The instructions did not advise, direct or instruct the jury what to find, but left them free to exercise their own judgment.

The motion for a new trial was properly overruled, and the judgment is affirmed.

Instructions omitted (accidentally) in the opinion:

If the defendant at the time the pistol was discharged, resulting in the death of Williams, was so intoxicated that he was totally unconscious of the events transpiring around him, and particularly of his own acts and the operations of his own mind, then he was incapable of any motive or intention, and was quite irresponsible for his acts, and that being the case, he is not guilty.

In determining this question you will well consider all the facts and circumstances in proof and bearing on this point, and particularly as to the accuracy and clearness of his recollection now as to what then took place. If he was so drunk at that time that he was unconscious of his own acts and of what took place, then his evidence now is of little or no weight as to what took place.

If he does now clearly recollect any of the circumstances then transpiring at the time of the shooting of Williams, it would tend to show that at that time he had his consciousness and knew what he was about. It is exclusively your province to determine from the evidence whether he knew what he was about. If he did, then he is responsible for any criminal act he may have committed.